**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

ACCENT MEDIA, INC.,
d/b/a Creativetravelsites.com,

       Plaintiff,

vs.

CAROL YOUNG AND ROBERT
YOUNG,

       Defendants and Third-Party
       Plaintiffs,

vs.

CEDAR RAPIDS COMMUNITY
SCHOOL DISTRICT,
in the County of Linn, State of Iowa

       Third-Party Defendant.

**ORDER**

12-CV-07-LRR

## *TABLE OF CONTENTS*

**I.**    **INTRODUCTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**II.**   **PROCEDURAL HISTORY.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
      *A.*    *Young Motion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
      *B.*    *CRCSD Motion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

**III.**  **SUBJECT MATTER JURISDICTION.** . . . . . . . . . . . . . . . . . . . . . . . **4**

**IV.**  **SUMMARY JUDGMENT STANDARD.** . . . . . . . . . . . . . . . . . . . . . . **5**

**V.**   **FACTUAL BACKGROUND.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

      *A.*    *Parties.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
      *B.*    *Jefferson High School San Diego Trip.* . . . . . . . . . . . . . . . . . . . **7**
      *C.*    *Alleged Use of Accent Media's Photographs.* . . . . . . . . . . . . . . . **8**
      *D.*    *Davenport Central High School and Pella High School.* . . . . . . . . **14**

**VI.    YOUNG MOTION AGAINST ACCENT MEDIA.** . . . . . . . . . . . . . . . . . . **16**

    **A.    Defamation.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

        **1.    Parties' arguments.** . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

        **2.    Applicable law.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

            **a.    Defamation per se.** . . . . . . . . . . . . . . . . . . . . **18**

            **b.    Defamation per quod.** . . . . . . . . . . . . . . . . . . . **20**

            **c.    Defenses.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

        **3.    Application.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

    **B.    Interference with Contractual Relations.** . . . . . . . . . . . . . . . **26**

        **1.    Interference with Accent Media's existing contract with Davenport Central High School.** . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

            **a.    Parties' arguments.** . . . . . . . . . . . . . . . . . . . . . **26**

            **b.    Applicable law.** . . . . . . . . . . . . . . . . . . . . . . . . **27**

            **c.    Application.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

        **2.    Interference with Accent Media's prospective contracts with Jefferson High School and Pella High School.** . . . . . . . . . . . **31**

            **a.    Applicable law.** . . . . . . . . . . . . . . . . . . . . . . . . **31**

            **b.    Jefferson High School.** . . . . . . . . . . . . . . . . . . . **33**

               **i.    Parties' arguments.** . . . . . . . . . . . . . . . . **33**

               **ii.    Application.** . . . . . . . . . . . . . . . . . . . . . **35**

            **c.    Pella High School.** . . . . . . . . . . . . . . . . . . . . . . **36**

               **i.    Parties' arguments.** . . . . . . . . . . . . . . . . **36**

               **ii.    Application.** . . . . . . . . . . . . . . . . . . . . . **37**

    **C.    Accent Media's Claims Against Robert Young.** . . . . . . . . . . . . . **37**

    **D.    Summary.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **39**

**VII.   YOUNG MOTION AGAINST CRCSD AND CRCSD MOTION.** . . . . . . . . **39**

    **A.    CRCSD's Release.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**

    **B.    Scope of Volunteer Duties.** . . . . . . . . . . . . . . . . . . . . . . . . . **44**

        **1.    Applicable law.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **45**

        **2.    Application.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **46**

            **a.    Defamation and interference with contractual relations.** **46**

            **b.    Copyright infringement.** . . . . . . . . . . . . . . . . . . **47**

    **C.    Iowa Municipal Tort Claims Act.** . . . . . . . . . . . . . . . . . . . . . **48**

        **1.    Applicable law.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **48**

        **2.    Application.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **50**

    **D.    Summary.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **50**

**VIII.  CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **51**

# I.  INTRODUCTION

The matters before the court are Defendants and Third-Party Plaintiffs Robert and Carol Young's (collectively, the "Youngs") Motion for Partial Summary Judgment ("Young Motion") (docket no. 25) and Third-Party Defendant Cedar Rapids Community School District's ("CRCSD") Motion for Summary Judgment ("CRCSD Motion") (docket no. 26).

# II.  PROCEDURAL HISTORY

On January 10, 2012, Accent Media, Inc. ("Accent Media") filed a Complaint (docket no. 2) against the Youngs asserting copyright infringement (Count I); interference with contractual relations (Count II); and defamation (Count III).  On March 8, 2012, the Youngs filed an Answer to the Complaint (docket no. 6), denying Accent Media's claims and asserting affirmative defenses.  In that same filing, the Youngs also filed a Third-Party Complaint against CRCSD.  In the Third-Party Complaint, the Youngs seek a declaratory judgment against CRCSD, directing CRCSD to defend and indemnify the Youngs against Accent Media's claims in the Complaint.

## A.  Young Motion

On May 24, 2013, the Youngs filed the Young Motion, requesting that the court grant summary judgment in Robert Young's favor as to Accent Media's copyright infringement claim in Count I and in the Youngs' favor with respect to Accent Media's interference with contractual relations claim in Count II and Accent Media's defamation claim in Count III.  In addition, the Youngs request that the court grant summary judgment in their favor as to their claim for indemnification for Accent Media's copyright infringement claim in their Third-Party Complaint against CRCSD.  On June 3, 2013, CRCSD filed CRCSD's Resistance to the Young Motion (docket no. 28).  On June 13, 2013, the Youngs filed a Reply to CRCSD's Resistance to the Young Motion (docket no. 35).  On July 1, 2013, Accent Media filed Accent Media's Resistance to the Young Motion

(docket no. 40). On July 11, 2013, the Youngs filed a Reply to Accent Media's Resistance to the Young Motion (docket no. 46).

The Young Motion is fully submitted and ready for decision.

## B. CRCSD Motion

On June 3, 2013, CRCSD filed the CRCSD Motion, requesting that the court grant summary judgment in its favor with respect to the Youngs' Third-Party Complaint seeking indemnification from CRCSD. On June 26, 2013, the Youngs filed a Resistance to the CRCSD Motion (docket no. 37). On July 8, 2013, CRCSD filed a Reply to the CRCSD Motion (docket no. 43).

In the CRCSD Motion, CRCSD requests the opportunity to present oral argument. The court finds that oral argument is unnecessary. The CRCSD Motion is fully submitted and ready for decision.

## III. SUBJECT MATTER JURISDICTION

The court has federal question jurisdiction over Accent Media's claim against the Youngs in Count I, which alleges copyright infringement in violation of Title 17 of the United States Code. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

The court has supplemental jurisdiction over Accent Media's state-law interference with contractual relationships claim in Count II and defamation claim in Count III because these claims are so related to the claim over which the court has federal question jurisdiction that they form part of the same case or controversy.[1] *See* 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are

---

[1] The court notes that, in the Complaint, Accent Media alleges that the court has pendant jurisdiction over the pendant state law claims. The court notes that the concept of pendant jurisdiction has now been codified and is referred to as supplemental jurisdiction.

so related to [the] claim[] in the action within such original jurisdiction that they form part of the same case or controversy . . . ."). In other words, "[t]he federal-law claim[] and state-law claims in the case derive from a common nucleus of operative fact and are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063, 1067 (8th Cir. 1996) (alteration in original) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988)) (internal quotation marks omitted).

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)), *cert. denied*, 132 S. Ct. 1144 (2012). "[S]elf-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010). "To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second alteration in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)) (internal quotation marks omitted). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).

## V. FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the nonmoving parties and

affording them all reasonable inferences, the uncontested material facts are as follows.

## A. Parties

The Youngs are residents of Linn County, Iowa and have served and volunteered for Jefferson High School in a variety of ways for more than twenty-two years. Among other things, the Youngs volunteered for the Jefferson High School Band and the Jefferson High School Fine Arts Department. Carol Young served as a videographer for student performances and athletic events. On occasion, Carol Young provided copies of her recordings to Jefferson High School. The Youngs accompanied the Jefferson High School Band on several out-of-state trips. Carol Young's role on these trips was to serve as a videographer and photographer. Carol Young would then create commemorative photograph discs and give copies to the Jefferson High School Band to sell to raise funds. The Youngs did not directly profit from their service to Jefferson High School, although they were reimbursed for any expenses they incurred on behalf of Jefferson High School. In addition, the Youngs received complimentary trips and hotel rooms in order to stay with the Jefferson High School Band when serving as volunteers on such trips.

Accent Media is an Iowa corporation with its principle place of business in Cedar Rapids, Iowa. Accent Media does business under the name "Creative Travel Sites" and uses the web address creativetravelsites.com. *See* Fictitious Name Resolution, Accent Media Appendix ("Accent Media App'x") (docket nos. 40-3 through 40-14) at 72. Accent Media is an audio and visual documentation and production company. Accent Media contracts with educational, social and fine arts groups to document events by producing images and making video and audio recordings. Accent Media publishes these images and recordings on the Internet, thereby making them available for customers to purchase. Doug Krejci is the President of Accent Media. Rodney Meyers works with Krejci at Accent Media. Meyers is the "co-founder . . . of Creative Travel Sites" along with Krejci. Rodney Meyers Deposition, CRCSD Appendix ("CRCSD App'x") (docket nos.

6

26-4 through 26-13) at 26.

CRCSD is a school corporation organized pursuant to Iowa Code Chapter 274. CRCSD includes Jefferson High School.

### B. *Jefferson High School San Diego Trip*

On November 30, 2009, Krejci and Meyers entered into a "Letter of Agreement" with Andy Houk and Thad Driskell. Letter of Agreement, CRCSD App'x at 34-35. Houk and Driskell were, at times relevant to the instant action, co-directors of the Jefferson High School Band, along with Helen Doreen Anderson. In the Letter of Agreement, Accent Media agreed "to produce a website of the Jefferson High School Band's trip to San Diego in December of 2009." *Id.* at 34. Pursuant to the Letter of Agreement, Accent Media created a website, www.jeffinsandiego09.com, where subscribers could view and purchase photographs that Accent Media took of the Jefferson High School band on the San Diego trip. The website included pictures of the Jefferson High School band before and during the San Diego trip. To view and purchase photographs on the website, users were required to create a username and password, pay a $20 subscription fee and agree to the User Agreement.

The Jefferson High School Band, along with Carol Young and an Accent Media videographer, went to San Diego from December 26, 2009 to January 1, 2010. Robert Young did not attend the San Diego trip. The Jefferson High School Band asked Carol Young to attend the trip to "take photos, take video, [and] compile a dis[c] for [Jefferson High School] students." Thad Driskell Deposition, Young Appendix ("Young App'x") (docket nos. 25-3 through 25-4, 37-4) at 18. Before December 26, 2009, Houk and Driskell made order forms for the students to use to purchase the discs. In addition, Accent Media began "[p]re-trip production" in April 2009 and began taking photographs of the band in October 2009. Accent Media's Response to the Youngs' Statement of Material Facts in Support of the Young Motion (docket no. 40-2) ¶ 85.

### C. Alleged Use of Accent Media's Photographs

On December 16, 2009, Carol Young subscribed to the Accent Media website and paid the $20 subscription fee to access the photographs that Accent Media representatives took on the San Diego trip. To subscribe to the Creative Travel Sites website, Carol Young agreed to Accent Media's User Agreement. The User Agreement includes the following language:

> This page contains the User Agreement ("Agreement") between you and CreativeTravelSites.com Company ("CTS"), the non-profit publisher of this Creative Travel Sites Web site (the "Site"). . . .
>
> This Agreement sets forth the terms and conditions for your use of this Site. Your use of the Site constitutes your agreement to these terms and conditions.
>
> . . . .
>
> 1. Your Rights.
>
> CTS grants you a non-exclusive, non-transferable, limited right to access, use and display this Site and the materials provided hereon provided that you comply fully with this Agreement. The contents of the Site are only for your personal, noncommercial use. You agree not to interrupt, or attempt to interrupt, the operation of this Site or any part of it in any way.
>
> . . . .
>
> All materials on the Site, including without limitation[,] text, images, software, audio and video clips, databases, user product reviews and ratings, Subscription-Based Services and other Site services and products (collectively, the "Content") are owned or controlled by CTS or the party credited as the provider of the Content. The respective owner retains all right, title, and interest in and to its Content. The Site and

Content are protected by the copyright and trademark laws of the United States and other countries, international conventions, and other applicable laws.

You may not download, display, reproduce, create derivative works from, transmit, sell, distribute, or in any way exploit the Site or any portion thereof, including without limitation our media and photos for any public and/or commercial use without the prior written permission of CTS. Should you gain permission for any commercial use of the site or any portion thereof, it will be the requestor of permission's responsibility to gain all releases or permissions necessary, not CTS.

Every piece of CTS generated media (photos, audio, or video clips) that is infringed upon counts as a singular violation of this end-user agreement.

You agree not to use any trademarks, service marks, names, logos, or other identifiers of CTS or its employees, licensors, independent contractors, providers and affiliates (collectively, "Affiliates") without the prior written permission of CTS or the relevant Affiliate. In addition, you may not use our trademarks:

(a) in, as, or as part of, your own trademarks or those of any third parties;

(b) to identify products or services that are not those of Creativetravelsites.com;

(c) in a manner likely to cause confusion; or

(d) in a manner that implies that Creativetravelsites.com sponsors or endorses or is otherwise connected with your own activities, products, and services or those of third parties.

. . . .

11. No-Commercial Use Policy

You agree to use the Site, Forums and products and services you purchase through out [the] Site, including the Subscription-Based Services, only in a noncommercial manner and in compliance with CTS's No-Commercial Use Policy. You specifically agree not to post, transmit or otherwise distribute to the Site (including without limitation to any Forum) any material containing any solicitation of funds, advertising or solicitation for goods or services without the prior approval of CTS.

20. General

This Agreement constitutes the entire agreement between you and CTS with respect to the Site and to your purchase of CTS's products and services offered through this Site, if applicable, including the Subscription-Based Services, and supersedes all prior agreements between you and CTS. Failure by CTS to enforce any provision of this Agreement shall not be construed as a waiver of any provision or right. Interpretation and enforcement of this Agreement shall be governed by the laws of the state of Iowa (excluding its choice of law rules). In the event that any portion of this Agreement is held unenforceable, the unenforceable portion shall be construed in accordance with applicable law as nearly as possible to reflect the original intentions of the parties, and the remainder of the provisions shall remain in full force and effect.

21. Liquidated Damages

Recognizing that actual damages in the event of a breach of this Agreement by the end-user will be difficult to ascertain with any reasonable degree of certainty, it is agreed that liquidated damages in the sum of $5000.00 shall be deemed reasonable and shall be assessed against and paid by the end-user for any and each violation of this Agreement. These liquidated damages are intended as a good faith estimate of actual damages and not as a penalty.

22. Attorney Fees and Costs

> In the event litigation is required to enforce the terms of this agreement, the end-user shall pay for attorney fees and costs.

User Agreement, Accent Media App'x at 28-29, 34, 36.

From December 16, 2009 until January 4, 2010, Carol Young downloaded photographs from the San Diego trip from the Accent Media website to her computer. On January 3 or 4, 2010, Carol Young put 1,830 photographs from the San Diego trip onto discs for the Jefferson High School Band. Carol Young downloaded 513 of the 1,830 photographs from the Accent Media website.

Carol Young gave the photograph discs to the Jefferson High School Band to sell and distribute. *See* 2009 Holiday Bowl Trip DVD and Picture CD Order Form (docket no. 2-2).[2] Students filled out the order forms created by Houk and Driskell in order to purchase discs. Students would "submit [the] form with a check to a designated individual. Those forms would then be . . . turned in to the Youngs so they would know how many [discs] to produce, and then [the Youngs would return the discs to Houk and Driskell] to distribute to the students." Driskell Deposition, Young App'x at 15.

On January 25, 2010, Accent Media sent Carol Young a Cease and Desist Letter. Cease and Desist Letter, CRCSD App'x at 94-96. The Cease and Desist Letter states that:

> [I]t has been brought to [Access Media's] attention that [Carol Young] ha[s] taken 513 photos from [Access Media's] Site and used them in violation of the . . . User Agreement by including them without [Access Media's] permission in [the] "Cedar Rapids Jefferson Band of Blue San Diego Tour

---

[2] The court notes that the parties disagree as to whether Houk or Driskell reviewed the discs before Carol Young made copies of the disc for distribution. *Compare* Youngs' Statement of Material Facts in Support of the Young Motion (docket no. 25-2) ¶ 47; Carol Young Deposition, Young App'x at 30, *with* Accent Media's Response to Youngs' Statement of Material Facts in Support of the Young Motion ¶ 47; Driskell Deposition, Accent Media App'x at 3; Houk Deposition, Accent Media App'x at 11.

> 2009—Photos" DVD disc. [Carol Young] then mass produced
> and sold copies of that DVD disc. [Carol Young's] actions in
> this regard are in direct violation of the . . . User Agreement
> and cannot be tolerated.

*Id.* at 95.

Carol Young responded to the Cease and Desist letter in writing, stating:

> I just did as the Jefferson Band Directors told me to do as a
> volunteer of the band. I didn't sell the product, didn't make
> any money off it. I turned everything over to the Band
> department. They took the orders and sold it to the parents.
>
> If your client told you anything different then he mislead [sic]
> you.
>
> This is the first and last communication I expect to have with
> you. If you have anything else, please contact the Cedar
> Rapids Jefferson High School and the Jefferson Band
> Department.

Carol Young Response to Cease and Desist Letter, Accent Media App'x at 40. Anderson, Houk and Driskell signed Affidavits providing that:

> at no time did [the Band Directors] ever suggest, direct or
> otherwise encourage in any way that Carol Young, or any
> other person, infringe, violate or otherwise compromise the
> Copyright or any other business interest of Douglas Krejci,
> Rodney Myers, or Creativetravelsites.com in regards to the
> Jefferson High School Band trip to San Diego from December
> 26, 2009 to January 1, 2010.

Anderson Affidavit, Houk Affidavit and Driskell Affidavit, Accent Media App'x at 54-56.

Accent Media received a Certificate of Registration from the United States Copyright Office, which "attests that [copyright] registration has been made for" Accent Media's website, www.jeffinsandiego09.com, for the distribution and viewing of the photographs that Accent Media took on the San Diego trip. Certificate of Registration, Accent Media App'x at 74. The Certificate of Registration is dated January 27, 2010. *Id.*

Accent Media demanded that CRCSD recall the discs that Carol Young provided and CRCSD did as requested. CRCSD returned the recovered discs to Accent Media after Accent Media released CRCSD from liability, however, CRCSD was unable to recover all of the discs. *See* General Release, CRCSD App'x at 36. The General Release, dated August 11, 2010, provides that, in consideration for Accent Media's receipt of nineteen of the discs that Carol Young created, Accent Media

> release[s], acquit[s] and forever discharge[s] [CRCSD] and its agents, employees and contractors, from any and all liability for any and all claims, demands and causes of action for damages which Releasers may have or ever claim to have by reason of the production, copying and distribution of the Band Videos.
>
> As further consideration of said receipt, the undersigned hereby agree:
>
> 1.    This Release covers all claims of any nature, whether known or not, and which may hereafter appear or develop, arising from the matters referred to above, including but not limited to, claims for tortious interference, libel, and copyright infringement.
>
> . . . .
>
> 5.    CR[C]SD represents that the 19 copies referred to in Paragraph 1 are the only copies in their possession at this time, and shall forward to the Releasors any additional copies of the CD in question that it may acquire by whatever means at any time without the need for further release.
>
> 6.    This Release shall not cover Carol Young or Robert Young.

*Id.*

On January 26, 2011, Krejci contacted Houk and Driskell to discuss the possibility

of Accent Media providing its services to the Jefferson High School Band for an upcoming trip. On January 27, 2011, Jefferson High School Principal Charles McDonnell sent an e-mail to Krejci and Myers, stating that:

> Jefferson High School is not contracting any media services for [its] upcoming San Diego trip or any other trips. [Jefferson High School] do[es] not want any volunteer or contracted services from Creative Travel Sites. Parent interests do not represent the wishes of the school and should not be taken as an interest for [Jefferson High School]. In the future if we change our stance on contracting media services, we will contact you and/or competitors based on our research into this area of service. Thanks for your interest.

January 27, 2011 E-mail, Accent Media App'x at 57.

### D. Davenport Central High School and Pella High School

Michael Reese was, at times relevant to the instant action, the Choir Director of Davenport Central High School. Prior to working at Davenport Central High School, Reese worked at Jefferson High School and worked with the Youngs in their role as volunteers. Since Reese moved to Davenport, he has maintained contact with the Youngs. On April 29, 2009, Krejci contacted Reese to discuss the possibility of Accent Media working with the Davenport Central High School Choir on an upcoming trip. April 29, 2009 and May 11, 2009 E-mails, Accent Media App'x at 64. On May 11, 2009, Reese responded to Krejci's e-mail, indicating that the Davenport Central High School Choir was interested in working with Accent Media. *Id.* On September 30, 2009, Reese signed a Letter of Agreement with Accent Media whereby Accent Media would "produce a website of the Davenport Central High School Choir trip to New York in March, 2010." Letter of Agreement, Accent Media App'x at 65. The Youngs were aware of the contractual relationship between Davenport Central High School and Accent Media. *See* Brief in Support of the Young Motion (docket no. 25-1) at 7-8.

In early 2010, Reese and Robert Young spoke on the phone. Robert Young

indicated that he did "not trust Krejci." Robert Young Affidavit, Young App'x at 81. In an e-mail exchange between Carol Young and Reese on January 29, 2010, Carol Young inquired as to why Reese did not respond to an earlier e-mail that she had sent Reese which appears to have advised Reese to reconsider his decision to work with Krejci. January 29, 2010 E-mails, Accent Media App'x at 94.[3] Reese responded, stating, in part,

> I read your first email in January and it started to confirm some things I was already starting to think about [D]oug [Krejci]. However, I wanted to continue to see where things went and see if I (and you) were correct about him. . . . We are just now starting to see some bigger problems with him. I am going to call [A]ndy [H]ouk and we are going to start the process of putting distance between [D]oug and ourselves. . . . [T]hanks for the heads up about [D]oug . . . he seems pretty fishy.

*Id.*

Davenport Central High School later withdrew from its agreement with Accent Media. In an e-mail to Krejci, Reese stated that Davenport Central High School had to back out of the agreement due to financial reasons. February 17. 2010 E-mails, Young App'x at 68-69; February 22, 2010 E-mail, Young App'x at 70-71; February 21, 2010 E-mail, Young App'x at 71.

In late 2009 and early 2010, Pella High School was planing a choir trip to Florida. At times relevant to the instant action, Megan Austin was an assistant band director at Jefferson High School and a former Pella student. Carol Young sent Austin an e-mail stating that "we have had a problem with using Doug Krejci on the Jefferson Band trip to San Diego," requesting that Austin inform others of this and suggesting that she "ask a lot of questions before using [Krejci]." January 29, 2010 E-mail, Young App'x at 74. Austin

---

[3] The court notes that the parties have not provided the court with a copy of the prior e-mails that Carol Young references in the January 29, 2010 e-mail exchange with Reese.

forwarded Carol Young's e-mail to Houk, stating "I'm not going to get involved in this and will ignore her email as I have no connection to or knowledge of her discussion at hand." January 30, 2010 E-mail, *id*. Pella High School never entered into a contract with Accent Media.

## VI. YOUNG MOTION AGAINST ACCENT MEDIA

In the Young Motion, the Youngs request that the court grant summary judgment in their favor with respect to: (1) Accent Media's defamation claim against the Youngs; (2) Accent Media's interference with contractual relations claim against the Youngs; and (3) Accent Media's copyright infringement claim against Robert Young. The court will address each argument in turn.

### A. Defamation

In Count III of the Complaint, Accent Media alleges that the Youngs "made false and slanderous statements to others . . . causing the Davenport Central School District and the Jefferson High School Band to cease to engage [Accent Media] for their services." Complaint ¶ 53. Accent Media asserts that "[t]he actions were false, and injured [Accent Media] in its business and are defamatory per se" or, alternatively, the "actions were committed with malice and are defamatory per quod." *Id*. ¶¶ 54-55. The parties agree that the alleged defamatory statements at issue consist of the Youngs' statements to Reese and Carol Young's statement to Austin.

### 1. Parties' arguments

In the Young Motion, the Youngs argue that any allegedly defamatory statements were "solely their opinions and are therefore absolutely protected." Young Motion at 2. In support of this assertion, the Youngs state that "[i]t was Carol Young's opinion that Jefferson High School had problems working with Accent Media" and that "[i]t was Robert Young's opinion that he personally did not trust . . . Krejci." Brief in Support of the Young Motion at 15. Furthermore, the Youngs contend that "even if the statements

16

could be deemed defamatory, the Youngs are protected by . . . qualified privilege." Young Motion at 2.

In Accent Media's Resistance to the Young Motion, Accent Media argues that the Youngs' statements were fact, not opinion, asserting that "[a] statement that someone is untrustworthy is not an opinion and the statements that there were problems with Accent Media, when it was [the] Youngs that caused the problems, are not true." Brief in Support of Accent Media's Resistance to the Young Motion (docket no. 40-1) at 12. In addition, Accent Media claims that the allegedly defamatory statements "were not published to be part of the marketplace of ideas," "were malicious" and were "made in anger in response to be [sic] caught engaging in unlawful copyright infringement." *Id.* Furthermore, Accent Media argues that the statements at issue are not protected by qualified privilege because "there is a substantial issue as to lack of good faith given the statements were made immediately after" Accent Media sent the Youngs the Cease and Desist letter and the Youngs "had no interests to protect other than vindictiveness, and directed their comments to other persons in Fine Arts programs for what could reasonably be inferred was the purpose of dissuading them from doing business with Accent Media." *Id.* at 13.

### 2. *Applicable law*

The Iowa Supreme Court has explained that "[d]efamation includes the twin torts of libel and slander. Libel involves written statements, while slander involves oral statements." *Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004) (citation omitted). "'[I]t is for the court, in the first instance to determine whether the words are capable of a defamatory meaning, and for the jury to determine whether they were so understood.'" *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 232 (Iowa 2004) (quoting *Brown v. First Nat'l Bank of Mason City*, 193 N.W.2d 547, 553 (Iowa 1972)).

"To establish a prima facie case in any defamatory action, a plaintiff must show the defendant (1) published a statement that was (2) defamatory (3) of and concerning the

17

plaintiff." *Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996); *see also Davenport v. City of Corning*, 742 N.W.2d 605 (Table), No. 06-1156, 2007 WL 3085797, at *5 (Iowa Ct. App. Oct. 24, 2007) ("To establish a prima facie case of slander, the plaintiff must show the defendant published a statement that was defamatory and concerned the plaintiff."); Iowa Civil Jury Instruction 2100.2 (listing the elements that a plaintiff must prove to state a claim for defamation per se); Iowa Civil Jury Instruction 2100.3 (listing the elements that a plaintiff must prove to state a claim for defamation per quod). "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559. "'Publication is an essential element of defamation and simply means a communication of statements to one or more third persons.'" *Davenport*, 2007 WL 3085797, at *5 (quoting *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996)). "Publication" for defamation purposes requires that the statement was "heard and understood by a third person." *Id.*

### a.      Defamation per se

Iowa courts recognize "two types of [defamation]: [defamation] per se and [defamation] per quod." *Schlegel v. Ottumwa Courier, a Div. of Lee Enters., Inc.*, 585 N.W.2d 217, 222 (Iowa 1998).[4]  A statement is defamation per se "if it has 'a natural tendency to provoke the plaintiff to wrath or expose him [or her] to public hatred, contempt, or ridicule, or to deprive him [or her] of the benefit of public confidence or social intercourse.'" *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996) (quoting *Prewitt v. Wilson*, 103 N.W. 365, 367 (Iowa 1905)). Statements are defamation per se and, therefore, actionable without proof of malice, falsity or injury if they are "of such a

_____

[4] The court notes that slander's definition is nearly identical to that of libel, however, with slander, the injurious words are conveyed by oral statements rather than written statements. Thus, the elements of a claim for slander and libel are nearly identical. *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 115 (Iowa 1984).

nature, whether true or not, that the court can presume as a matter of law that their publication will have a [defamatory] effect." *Vinson*, 360 N.W.2d at 116 (citing *Haas v. Evening Democrat Co.*, 107 N.W.2d 444, 447 (Iowa 1961)). In Iowa, a plaintiff must prove the following elements to allege a claim for libel or slander per se: (1) the defendant made the statements; (2) the defendant communicated the statements to someone other than the plaintiff; and (3) the statements would reasonably be understood to be an expression which would attack a person's integrity or moral character, expose the person to public hatred, contempt or ridicule, deprive the person of the benefits of public confidence and social dealings or injure the plaintiff in the maintenance of his or her business. Iowa Civil Jury Instruction 2100.2; *see also Vinson*, 360 N.W.2d at 116.

When statements are defamatory per se, a jury may "award substantial damages without the necessity of the plaintiff proving actual damage to reputation." *Schlegel*, 585 N.W.2d at 222. "In case of statements that are [defamatory] per se, damages for mental anguish or hurt feelings are allowed because damage to reputation is presumed." *Id.*; *see also Sawheny v. Pioneer Hi-Bred Int'l Inc.*, 93 F.3d 1401, 1410 (8th Cir. 1996) ("Under Iowa law . . . [a]ttacking the integrity and moral character of a party constitutes [defamation] per se."); *Huegerich*, 547 N.W.2d at 221 ("To accuse a person of an indictable crime is defamation per se."); *Spencer v. Spencer*, 479 N.W.2d 293, 296 (Iowa 1991) (finding that publishing statements accusing someone of "being a liar, a cheater, or thief" qualifies as defamation per se); *Overstreet v. New Nonpareil Co.*, 167 N.W. 669, 672 (Iowa 1918) (finding that publishing statements that an individual is untrustworthy, a hypocrite and a traitor in his employment is actionable per se).

Defamatory imputations affecting a person in his or her business, trade profession or office may qualify as defamation per se. *See Lara v. Thomas*, 512 N.W.2d 777, 785 (Iowa 1994) (citing Restatement (Second) of Torts §§ 570, 573); Restatement (Second) of Torts § 573 ("One who publishes a [defamatory statement] that ascribes to another

conduct, characteristics or a condition that would adversely affect his [or her] fitness for the proper conduct of his [or her] lawful business, trade or profession, or of his [or her] public or private office, whether honorary or for profit, is subject to liability without proof of special harm."). However, "general disparagement" does not qualify as defamation per se. Restatement (Second) of Torts § 573, cmt. e. Rather, to be actionable per se, the allegedly defamatory statements "must affect the plaintiff in some way that is peculiarly harmful to one engaged in his [or her] trade or profession." *Id*. "Disparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character that it is peculiarly valuable in the plaintiff's business or profession." *Id*. (providing, for example, that "a statement that a physician consorts with harlots is not actionable per se, although a charge that he makes improper advances to his patients is actionable").

### b.    *Defamation per quod*

Defamation per quod, on the other hand, "simply means that one must refer to facts or circumstances beyond the words actually used to establish the defamation." *Schlegel*, 585 N.W.2d at 222. To establish defamation per quod, "a plaintiff must first prove actual damage to reputation before the plaintiff can recover for mental anguish or hurt feelings." *Id*. In Iowa, a plaintiff must prove the following elements to state a claim of libel or slander per quod: (1) the defendant made a written or oral statement concerning the plaintiff; (2) the statement was false; (3) the defendant made the statement with malice; (4) the defendant communicated the statement to someone other than the plaintiff; (5) the statement tended to injure the reputation of the plaintiff, expose the plaintiff to public hatred, contempt or ridicule or injure the plaintiff in his or her efforts to maintain his or her business; (6) the statement caused damage to the plaintiff; and (7) the amount of damage. Iowa Civil Jury Instruction 2100.3; *see also Vinson*, 360 N.W.2d at 115.

### c. Defenses

To make a defamation claim when the statements at issue do not qualify as defamation per se, "the statements must be false and demonstrably about the person claiming to be defamed." *Huegerich*, 547 N.W.2d at 221 (citing Restatement (Second) of Torts § 558); *see also* Restatement (Second) of Torts § 558 ("To create liability for defamation there must be: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication."). "The truth of the statement is an absolute defense." *Huegerich*, 547 N.W.2d at 221; *see also Behr v. Meredith Corp*, 414 N.W.2d 339, 342 (Iowa 1987) (recognizing substantial truth as a defense to a defamation claim and noting that it is not necessary for a defendant in a defamation action "to establish the literal truth of the publication in every detail as long as the 'sting' or 'gist' of the defamatory charge is substantially true" (quoting *Hovey v. Iowa State Daily Publ'n Bd., Inc.*, 372 N.W.2d 253, 256 (Iowa 1985)).

In addition to substantial truth, a showing that the allegedly defamatory statement is a statement of opinion may be a defense to a defamation claim because "[o]pinion is absolutely protected under the First Amendment." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir. 1986). However, a statement couched as opinion may nonetheless be actionable if it contains or implies sufficient factual content. *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 768-71 (Iowa 2006) ("'[S]tatements of opinion can be actionable if they imply a provable false fact, or rely upon stated facts that are provably false.'" (quoting *Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994))). Thus, in determining whether a statement of opinion is in fact actionable, the court must determine "whether the alleged defamatory statement can reasonably be interpreted as stating actual facts and whether those facts are capable of being proven true or false." *Id.* at 771.

In *Janklow*, the Eighth Circuit adopted the factors for determining whether a statement is fact or opinion that the D.C. Circuit Court of Appeals articulated in *Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984). *See Janklow*, 788 F.2d at 1302. The Iowa Supreme Court has, in turn, adopted those factors. *Yates*, 721 N.W.2d at 770. Thus, the court's analysis of whether a statement is fact or opinion requires the consideration of the following factors: (1) the precision and specificity of the allegedly defamatory statement; (2) the degree to which the statement is objectively capable of being proved or disproved; (3) the literary context in which the statement is made; and (4) the broader social context into which the statement fits. *Id.*

Qualified privilege may also be a defense to a defamation claim. "Qualified privilege is an affirmative defense that must be pleaded and proved." *Vinson*, 360 N.W.2d at 116.

> A qualified privilege exists with respect to statements that are otherwise defamatory if the following elements exist: (1) the statement was made in good faith; (2) the defendant had an interest to uphold; (3) the scope of the statement was limited to the identified interest; and (4) the statement was published on a proper occasion, in a proper manner and to proper parties only.

*Barreca v. Nickolas*, 683 N.W.2d 111, 118 (Iowa 2004) (quoting *Winckel v. Von Maur, Inc.*, 652 N.W.2d 453, 458 (Iowa 2002)). The question of whether qualified privilege is available in a particular case is ordinarily a question for the court to determine, rather than a jury. *Vinson*, 360 N.W.2d at 116.

### 3. Application

The specific statements at issue in Count III are: (1) Robert Young's statement to Reese that he did "not trust Krejci," Robert Young Affidavit, Young App'x at 83; (2) Carol Young's January 29, 2010 e-mail to Reese in which she inquired as to why Reese did not respond to an earlier e-mail that she sent Reese which appears to have advised Reese to reconsider his decision to work with Krejci, January 29, 2010 E-mails, Accent

Media App'x at 94; and (3) Carol Young's e-mail to Austin stating that "we have had a problem with using . . . Krejci on the Jefferson Band trip to San Diego" and suggesting that Austin inform others of this and that Pella High School officials "ask a lot of questions before using [Krejci]," January 29, 2010 E-mail, Young App'x at 74.[5]

At the outset, the court shall address the Youngs' assertion that they are entitled to qualified privilege. As discussed above, "[q]ualified privilege is an affirmative defense which must be pleaded and proved." *Vinson*, 360 N.W.2d at 116. Pursuant to Federal Rule of Civil Procedure 8(c), an affirmative defense such as qualified privilege must be pleaded in responsive pleadings to the complaint. Fed. R. Civ. P. 8(c); *see Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1385 (N.D. Iowa 1996) (listing cases holding that failure to plead an affirmative defense to a claim in a responsive pleading waives or forecloses the assertion of that defense for the first time later in the litigation). The Youngs raise several affirmative defenses in their Answer, however, they do not raise qualified privilege as an affirmative defense. An affirmative defense that is not properly pleaded is waived. *Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259, 1266 (8th Cir. 1994); *Vinson*, 360 N.W.2d at 116 ("Qualified privilege is an affirmative defense that must be pled and proved."). Thus, the court finds that the Youngs waived qualified privilege as an affirmative defense to Count III.

Next, the court shall address whether the allegedly defamatory statements qualify as defamation per se. Aside from Accent Media's allegation in the Complaint that the statements "injured [Accent Media] in its business and are defamatory per se," Complaint ¶ 54, Accent Media has provided the court with no support for its assertion that the statements are actionable per se. Although Accent Media asserts that the allegedly defamatory statements are defamation per se because they harmed Accent Media's

---

[5] The court notes that each of the allegedly defamatory statements refer to Krejci, who is not a named plaintiff, rather than Accent Media.

business, the allegedly defamatory statements—that Robert Young did not trust Krejci and Carol Young's e-mails to Reese and Austin—are not "particularly disparaging of one engaged" in the occupation of audio and visual documentation and production. *See* Restatement (Second) of Torts § 573, cmt. e. Furthermore, the statements do not have "'a natural tendency to provoke [Accent Media] to wrath or expose [it] to public hatred, contempt, or ridicule, or to deprive [it] of the benefit of public confidence or social intercourse.'" *Johnson*, 542 N.W.2d at 510 (quoting *Prewitt*, 103 N.W. at 367). Thus, the court cannot "presume as a matter of law that their publication will have a [defamatory] effect." *Vinson*, 360 N.W.2d at 115-16. In light of the court's determination that the statements at issue are not defamation per se, Accent Media must show that the allegedly defamatory statements are defamation per quod. *See Mechdyne Corp. v. Garwood*, 707 F. Supp. 2d 864, 874 (S.D. Iowa 2009) (finding that, because the alleged defamatory statements did not attack the plaintiff's "integrity or moral character and therefore lack[ed] the earmarks of [defamation] per se," the court must "analyze the allegedly defamatory statements under the [defamation] per quod standard").

As discussed above, Accent Media must prove the following elements to state a claim of defamation per quod: (1) the Youngs made a written or oral statement concerning Accent Media; (2) the statement was false; (3) the Youngs made the statement with malice; (4) the Youngs communicated the statement to someone other than Accent Media; (5) the statement tended to injure the reputation of Accent Media, expose Accent Media to public hatred, contempt or ridicule or injure Accent Media in its efforts to maintain its business; (6) the statement caused damage to Accent Media; and (7) the amount of damage. Iowa Civil Jury Instruction 2100.3; *see also Vinson*, 360 N.W.2d at 115. Furthermore, as discussed above, a showing by the Youngs that the statements are substantially true or are opinion is a defense to this claim.

The court finds that Accent Media's defamation claim fails. First, Accent Media has not shown that the allegedly defamatory statements are false. In fact, the only

assertion that Accent Media makes with respect to falsity is that the Youngs' statements that "there were problems with Accent Media, when it was [the] Youngs [who] caused the problems, are not true." Brief in Support of Accent Media's Resistance to the Young Motion at 12. The court finds that this argument is without merit. There is no allegation that Carol Young claimed that Accent Media created problems itself; rather, Carol Young simply stated that "we have had a problem with using . . . Krejci on the Jefferson [High School] Band trip to San Diego." January 29, 2010 E-mail, Young App'x at 74. Carol Young's statement is not false and does not place the blame for the "problem" on Accent Media. In addition, the court finds that Accent Media has failed to show that Robert Young's statement to Reese that he did "not trust Krejci," Robert Young Affidavit, Young App'x at 83, and Carol Young's January 29, 2010 e-mail to Reese in which she inquired as to why Reese did not respond to an earlier e-mail that she had sent Reese which appears to have advised Reese to reconsider his decision to work with Krejci, January 29, 2010 E-mails, Accent Media App'x at 94, are false. Thus, the court finds that the alleged defamatory statements are substantially true.

Second, Accent Media has not shown that the allegedly defamatory statements are fact, rather than opinion. Accent Media asserts that Robert Young's statement that he "did not trust Krejci" is "another way of saying Krejci was untrustworthy" and "[a] statement that someone is untrustworthy is not an opinion." Brief in Support Accent Media's Resistance to the Young Motion at 12. The court finds that this argument is without merit. Robert Young stated that *he* did not trust Krejci; he did not state that Krejci *is* untrustworthy. Thus, Robert Young merely stated his opinion as to Krejci's trustworthiness and Accent Media's claim that this statement is defamatory fails for this additional reason. *See Yates*, 721 N.W.2d at 770 (listing the factors that the court should consider in determining whether a statement is fact or opinion). Accent Media makes no argument supporting its assertion that any other allegedly defamatory statements are fact, rather than opinion. However, in view of the court's finding that the additional allegedly

defamatory statements are substantially true, the court finds it unnecessary to address whether they are fact or opinion. Accordingly, the court shall grant the Young Motion to the extent that it requests the court grant summary judgment in favor of the Youngs with respect to Count III.

## B. Interference with Contractual Relations

In Count II of the Complaint, Accent Media asserts that the Youngs interfered with Accent Media's existing and prospective contractual relationship with Davenport Central High School and with Accent Media's existing and prospective relationships with Jefferson High School and other schools within the Cedar Rapids School District.[6]

### 1. Interference with Accent Media's existing contract with Davenport Central High School

#### a. Parties' arguments

Accent Media alleges that the Youngs interfered with its existing contract with Davenport Central High School by making disparaging statements about Krejci to Reese, resulting in Reese's termination of the contract between Davenport Central High School and Accent Media. The Youngs argue that Carol Young's communications with Reese were not improper because, in light of "her years of friendship with Reese, it was reasonable under the circumstances that she would share with Reese what was going on in her life, including allegations by Accent Media that she had done something improper." Brief in Support of the Young Motion at 8. Furthermore, the Youngs claim that their communications with Reese were not "undertaken for the purpose of interfering with Accent Media's contract with Davenport Central [High School]; rather, they were

---

[6] Based on Accent Media's arguments in its Resistance to the Young Motion, it appears that Accent Media is only alleging interference with an existing contract with Davenport Central High School and interference with a prospective contract with Jefferson High School. Furthermore, in light of the court's findings below, the court finds that it is unnecessary to address any additional interference with contractual relations claims that Accent Media may purport to allege, as any such claims are without merit.

communications between friends and colleagues undertaken in the context of a longstanding friendship" and that "[a]ny mention of Accent Media . . . [was] merely a consequence of the longstanding relationship between the Youngs and . . . Reese." *Id.* at 9. Additionally, the Youngs argue this claim fails because Accent Media cannot show that Carol Young's communication with Reese caused Davenport Central High School to breach its contract with Accent Media.

In Accent Media's Resistance to the Young Motion, Accent Media asserts that the court should not grant summary judgment in favor of the Youngs with respect to this portion of Count II because the fact that the Youngs expressed dissatisfaction with Accent Media to both Reese and Austin around the same time shows that "Carol Young was not sharing what was going on in her life, but rather, engaged in a campaign to cause problems with Krejci's business because [Krejci] asserted a legitimate and protected right" when he sent Carol Young the Cease and Desist Letter. Brief in Support of Accent Media's Resistance to the Young Motion at 8.

### b. *Applicable law*

Under Iowa law, if "the defendant induces or otherwise causes [a] third person not to perform the contract, the defendant is liable to the other person (plaintiff) for damages from the failure of the third person to perform the contract." *RTL Distrib., Inc. v. Double S Batteries, Inc.*, 545 N.W.2d 587, 590 (Iowa Ct. App. 1996) (citing Restatement (Second) of Torts § 766); *see also* Restatement (Second) of Torts § 766 ("One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."). The elements of a claim asserting intentional interference with an existing contract are:

> (1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and

improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.

*Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 243 (Iowa 2006) (quoting *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 399 (Iowa 2001)) (internal quotation marks omitted). To state a proper claim alleging interference with contractual relations, the interference must be both intentional and improper. "The intent to interfere with a contract does not make the interference improper." *Id.* at 244.

The factors that a court considers when determining whether a defendant's conduct was improper include: (1) the nature of the conduct; (2) the defendant's motive; (3) the interests of the party with which the conduct interferes; (4) the interest that the defendant seeks to advance; (5) the social interests in protecting the freedom of action of the defendant and the contractual interests of the other party; (6) the nearness or remoteness of the defendant's conduct to the interference; and (7) the relations between the parties. *See id.*; *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 767 (Iowa 1999)); Restatement (Second) of Torts § 767. "The basic focus of the analysis is 'whether the [defendant's] conduct was fair and reasonable under the circumstances.'" *Fin. Mktg. Servs., Inc. v. Hawkeye Bank & Trust of Des Moines*, 588 N.W.2d 450, 458 (Iowa 1999) (quoting *Toney v. Casey's Gen. Stores, Inc.*, 460 N.W.2d 849, 853 (Iowa 1990)). Furthermore, the Iowa Supreme Court has held that:

> [I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the [defendant] engaged in for an entirely different purpose, his [or her] knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.

*Berver v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996) (quoting Restatement (Second) of Torts § 767 cmt. d) (first alteration in original).

"Thus, conduct is generally not improper if it was merely a consequence of actions taken for a purpose other than to interfere with a contract." *Green*, 713 N.W.2d at 244. Furthermore, a court "may not find improper interference where the defendant has a right or duty to act." *Fischer v. UNIPAC Serv. Corp.*, 519 N.W.2d 793, 800 (Iowa 1994). However, "[i]nterference achieved through conduct that is dishonest, fraudulent, malicious, or otherwise wrongful will support a finding that the interference is improper." *Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 663-64 (Iowa 2008). Under certain circumstances, "the [defendant's] conduct should be permitted without liability, despite its effect of harm to another," and the decision "depends upon a judgment and choice of values in each situation." Restatement (Second) of Torts § 767 cmt. b.

In addition to the factors listed in section 767 of the Restatement (Second) of Torts, sections 768 through 773 provide specific circumstances in which interference with a contractual relationship is *not* improper. For example, the Restatement (Second) of Torts provides that "[o]ne who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person . . . truthful information." *Id.* § 772. Thus, the Restatement (Second) of Torts, and Iowa courts, recognize a privilege for a person to interfere with a contract by giving honest advice to a third person.

> There is of course no liability for interference with a contract or with a prospective contractual relation on the part of one who merely gives truthful information to another. The interference in this instance is clearly not improper. This is true even though the facts are marshaled in such a way that they speak for themselves and the person to whom the information is given immediately recognizes them as a reason for breaking his contract or refusing to deal with another. It is also true whether or not the information is requested.

Restatement (Second) of Torts § 772, cmt. b.

### c. *Application*

The Youngs admit that Accent Media had a contract with Davenport Central High School and that they were aware of such contract. Thus, the disputed elements of Accent Media's claim against the Youngs in this portion of Count II are whether: (1) the Youngs intentionally and improperly interfered with the contract; and (2) whether the interference caused Davenport Central High School not to perform the contract. *See Green*, 713 N.W.2d at 243.

With respect to whether the Youngs improperly interfered with the contract, the court finds that the Youngs' truthful statements are not improper as a matter of law. See Restatement (Second) of Torts § 772; *see also Dillon v. Ruperto*, 786 N.W.2d 873 (Table), No. 09-0600, 2010 WL 2383517 (Iowa Ct. App. June 16, 2010), at *6 (applying § 772 and finding that truth is a defense to a claim for tortious interference with a contract). Robert Young's statement that he did "not trust Krejci," Robert Young Affidavit, Young App'x at 81, is true because it is his opinion. Thus, this statement cannot support a claim for interference with an existing contract.

The only other statement that could possibly support this claim is Carol Young's e-mail to Reese in which she inquired into why Reese did not respond to an earlier e-mail which appears to have advised Reese to reconsider his decision to work with Krejci. January 29, 2010 e-mails, Accent Media App'x at 94.[7] The exchange between Carol Young and Reese demonstrates that "[Carol Young] didn't get an answer and . . . really thought [Reese] w[as] mad at [her]" and that Carol Young's e-mail "started to confirm some things [Reese] was already starting to think about [D]oug." *Id.* Although the

---

[7] To the extent that Accent Media alleges that Carol Young's prior e-mail to Reese, which was referenced in the January 29, 2010 e-mail, supports its interference with an existing contract claim, the court finds this argument to be without merit. Accent Media has not provided the court with the e-mail and has not filed an appropriate motion to compel the Youngs to provide the e-mail. Thus, the court will not speculate as to the contents of that e-mail.

context suggests that Carol Young was referencing Krejci in her January 29, 2010 e-mail, this e-mail makes no disparaging statement about Accent Media whatsoever. Thus, Carol Young's January 29, 2010 e-mail to Reese cannot form the basis for an interference with an existing contract claim.

Accent Media does not provide the court with any legal authority, and the court is aware of none, that supports a finding that the Youngs' statements to Reese support a claim for interference with existing contractual relations. The Youngs' conduct was not "dishonest, fraudulent, malicious or otherwise wrongful." *Kern*, 757 N.W.2d at 663. Furthermore, the Youngs' statements to Reese were "fair and reasonable under the circumstances" and not improper. *Fin. Mktg. Servs., Inc.*, 588 N.W.2d at 458 (quoting *Toney*, 460 N.W.2d at 853) (internal quotation mark omitted). In addition, Accent Media has not shown in its Resistance to the Young Motion that the statements at issue caused Davenport Central High School not to perform the contract. Therefore, the court finds that there is no genuine issue of material fact as to whether the Youngs tortiously interfered with Accent Media's existing contract with Davenport Central High School. Accordingly, the court shall grant the Young Motion to the extent it requests the court grant summary judgment in the Youngs' favor on this portion of Count II.

### 2. *Interference with Accent Media's prospective contracts with Jefferson High School and Pella High School*

#### a. *Applicable law*

Section 766B of the Restatement (Second) of Torts sets forth the relevant standard for claims alleging intentional interference with a prospective contract. *See Nesler v. Fisher & Co.*, 452 N.W.2d 191, 195 (Iowa 1990) (applying section 766B to an interference with prospective contract claim). Section 766B provides:

> One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B. The elements of a claim alleging intentional interference with a prospective contract are essentially the same as those of a claim alleging intentional interference with an existing contract:

1. The plaintiff had a prospective contractual relationship with a third person.

2. The defendant knew of the prospective relationship.

3. The defendant intentionally and improperly interfered with the relationship in one or more particulars.

4. The interference caused the third party not to enter into or to continue the relationship or that the interference prevented the plaintiff from entering into or continuing the relationship.

5. The amount of damage.

*Willey v. Riley*, 541 N.W.2d 521, 527 (Iowa 1995); *see also Green*, 713 N.W.2d at 243 (listing the elements of an interference with existing contract claim). In addition, the factors that a court considers when determining whether a defendant's conduct was improper are the same factors as those discussed above with respect to interference with an existing contract. *See* Restatement (Second) of Torts § 767 (listing factors a court should consider in determining whether interference is improper); *see also id.*, cmt. a (providing that section 767 applies to claims asserting interference with an existing contract by causing a third party not to perform his contract with the plaintiff (as in section 766) as well as claims asserting interference with prospective contractual relations (as in section 766B)).

However, the court's analysis of those factors may not be the same with respect to

a prospective contract. *See* Restatement (Second) of Torts § 767, cmt. a ("[T]he weight carried by these factors may vary considerably and the determination of whether the interference is improper may also vary" depending on which form of the "interference with contractual relations" tort is alleged.). "In cases involving interference with a prospective contract, the defendant's purpose must be to financially injure or damage [the] plaintiff's business." *RTL Distrib., Inc.*, 545 N.W.2d at 590. "There must be substantial evidence of a predominant motive by the defendant to terminate the contract for improper reasons." *Id.* Thus, the distinction between the tort of interference with an existing contract and interference with a prospective contract "is that to recover for interference with *prospective* business relations, a plaintiff must prove the defendant acted with the sole or predominant purpose to injure or financially destroy the plaintiff." *Campiano v. Hawkeye Bank & Trust of Des Moines*, 588 N.W.2d 462, 464 (Iowa 1999). "If a defendant acts for two or more purposes, his improper purpose must predominate in order to create liability." *Tredrea v. Anesthesia & Analgesia, P.C.*, 584 N.W.2d 276, 283 (Iowa 1998). Thus, when an interference with contractual relations claim involves a prospective contract, the standard of proof is higher.

### b. *Jefferson High School*

#### i. *Parties' arguments*

Accent Media argues that the Youngs interfered with Accent Media's prospective contract with Jefferson High School when Carol Young responded to Accent Media's Cease and Desist Letter. Carol Young's response to Accent Media's Cease and Desist letter stated:

> I just did as the Jefferson Band Directors told me to do as a volunteer of the band. I didn't sell the product, didn't make any money off it. I turned everything over to the Band department. They took the orders and sold it to the parents. If your client told you anything different then he mislead [sic] you.
> This is the first and last communication I expect to have with

> you. If you have anything else, please contact the Cedar
> Rapids Jefferson High School and the Jefferson Band
> Department.

Carol Young Response to Cease and Desist Letter, Accent Media App'x at 40. In the
Young Motion, the Youngs contend that the court should grant summary judgment in their
favor with respect to this portion of Count II because "there is no evidence that Carol or
Robert Young intentionally and improperly interfered" with a prospective contract between
Accent Media and Jefferson High School, Brief in Support of the Young Motion at 11, and
because "Accent Media cannot show that any act by Robert or Carol Young caused its
prospective contractual relationship with Jefferson High School to fail to materialize." *Id.*
at 12. With respect to the former assertion, the Youngs point out that the Cease and Desist
Letter *demanded* that Carol Young respond to it and, thus, there is "simply no evidence
that Carol Young's 'sole and predominate' purpose in sending [the Carol Young Response
to the Cease and Desist Letter] was to financially injure or destroy Accent Media." *Id.*

In Accent Media's Resistance to the Young Motion, Accent Media argues that the
Youngs interfered with Accent Media's prospective relationship with Jefferson High
School because "Carol Young[] did not accept responsibility for the illegal infringement[]
and agree to Accent Media's demand for an apology, but rather responded to the [C]ease
and [D]esist [L]etter claiming the actions were done at the direction of the Jefferson [High
School] Band Director," who, subsequently, provided an affidavit asserting that Jefferson
High School did not direct the infringement. Brief in Support of Accent Media's
Resistance to the Young Motion at 9. Accent Media claims that it asserted a legitimate
claim for copyright infringement against the Youngs, and the Youngs "complained" to
Jefferson High School. *Id.* at 10. Thus, according to Accent Media, "[i]t is reasonable
to infer why Accent Media has not done anything further with Jefferson [High School]."
*Id.* Additionally, in Accent Media's Response to the Youngs' Statement of Material Facts
in Support of the Young Motion, Accent Media asserts that Carol Young's Response to

the Cease and Desist Letter "attempts to force [Jefferson High School] to become involved and causes them to distance themselves from the situation by cutting ties with [Accent Media]." Accent Media's Response to Youngs' Statement of Material Facts in Support of the Young Motion ¶ 76.

### ii. Application

As discussed above, Accent Media's burden is higher with respect to this interference with a prospective contract claim than for an interference with an existing contract claim. "In cases involving interference with a prospective contract, the defendant's purpose must be to financially injure or damage [the] plaintiff's business." *RTL Distrib., Inc.*, 545 N.W.2d at 590. *See also Campiano*, 588 N.W.2d at 464 ("[T]o recover for interference with *prospective* business relations, a plaintiff must prove the defendant acted with the sole or predominant purpose to injure or financially destroy the plaintiff."). There is no evidence that the Youngs' primary purpose was to prevent Jefferson High School from entering into a future contract with Accent Media. The Cease and Desist Letter demanded a response from Carol Young, and Carol Young did as the Letter required.[8] Thus, the court finds that this claim is without merit because Accent Media has failed to show that Carol Young's predominant purpose in responding to Accent Media as requested by the Cease and Desist Letter was to financially injure or destroy Accent Media.[9]

Furthermore, Accent Media has failed to show that the Youngs did anything

---

[8] Accent Media suggests that the Youngs "complained" to Jefferson High School administrators. However, Accent Media does not reference any specific statements that the Youngs' made to any individuals at Jefferson High School with respect to this claim in Accent Media's Resistance to the Young Motion. Rather, the basis of this claim appears to be Carol Young's response to Accent Media regarding the Cease and Desist Letter.

[9] The court notes that the communication at issue is between Carol Young and Accent Media, not Jefferson High School.

improper to give rise to a claim for interference with a prospective contract. The court has weighed the appropriate factors pursuant to the Restatement (Second) of Torts section 767, and finds that they do not favor a finding that Carol Young's response to the Cease and Desist Letter was improper. *See* Restatement (Second) of Torts § 767. Finally, Accent Media has not shown that the statements at issue caused a prospective contract with Jefferson High School to fail to materialize. Accordingly, the court shall grant the Young Motion to the extent it requests the court grant summary judgment in the Youngs' favor on this portion of Count II.

### c. *Pella High School*

#### i. *Parties' arguments*

At the outset, the court notes that the Complaint makes no specific reference to a prospective contract with Pella High School. Consequently, Accent Media has no basis to assert liability against the Youngs as to Pella High School and the court need not address this portion of the Young Motion. Nonetheless, the Youngs address the issue in the Young Motion and the court will briefly discuss it. In the Young Motion, the Youngs argue that the court should grant summary judgment in their favor with respect to their alleged interference with Accent Media's prospective contract with Pella High School because: (1) there was no prospective contract between Accent Media and Pella High School; (2) the Youngs did nothing to improperly interfere with any relationship between Accent Media and Pella High School; and (3) Accent Media cannot show that Carol Young's e-mail to Austin prevented any prospective relationship between Accent Media and Pella High School from materializing.

In Accent Media's Resistance to the Young Motion, Accent Media argues that there is a genuine issue of material fact as to whether the Youngs interfered with Accent Media's prospective contract with Pella High School when Carol Young communicated with Austin because the Youngs "must have known about the potential a contract might materialize with Pella [High School] because there would be no reason for contacting Austin." Brief

in Support of Accent Media's Resistance to the Young Motion at 11.

### ii.  *Application*

Krejci testified that Accent Media had no direct communication with anyone from Pella High School.  Rather, the alleged prospective contract is due to communications between John Piquette, president of Integrity Travel, and Pella High School in regard to Integrity Travel making travel arrangements for Pella High School's choir trip to Florida. Krejci Deposition, Accent Media App'x at 21.  Furthermore, Carol Young's e-mail to Austin suggests that Austin knew several individuals at Pella High School, however, there is no allegation that Austin herself was employed at Pella High School.  Finally, Austin indicated that she was going to "ignore" Carol Young's e-mail.  January 30, 2010 e-mail, Young App'x at 74.

There is no evidence that Carol Young's primary purpose in contacting Austin was to prevent Pella High School from entering into a future contract with Accent Media. Carol Young merely suggested that Pella High School "ask a lot of questions before using [Krejci]" and sought to "warn" Pella High School to be cautious before working with Krejci.  January 29, 2010 e-mail, Young App'x at 74.  Furthermore, Accent Media has failed to show that the Youngs did anything improper to give rise to a claim for interference with a prospective contract.  The court has weighed the appropriate factors pursuant to the Restatement (Second) of Torts section 767, and finds that they do not support a finding that Carol Young's January 29, 2010 e-mail to Austin was improper. *See* Restatement (Second) of Torts § 767.  Finally, Accent Media has not shown that Carol Young's January 29, 2010 e-mail to Austin caused a prospective contract between Accent Media and Pella High School to fail to materialize.  Accordingly, the court shall grant the Young Motion to the extent it requests the court grant summary judgment in the Youngs' favor on this portion of Count II.

### C.  *Accent Media's Claims Against Robert Young*

In the Young Motion, the Youngs argue that the court should grant summary

judgment in favor of Robert Young with respect to Accent Media's claims against him asserting copyright infringement, defamation and interference with contractual relationships because "Accent Media . . . has no facts to support any of these claims against Robert Young." Brief in Support of the Young Motion at 7. In Accent Media's Resistance to the Young Motion, Accent Media argues that it properly alleged that Robert Young defamed Accent Media and that he improperly interfered with Accent Media's contract with Davenport Central High School. With respect to Accent Media's copyright infringement claim against Robert Young, it argues that "it is reasonable to infer both Youngs are not testifying truthfully with respect to Robert[ Young's] role given there is no direct evidence of his activities" and that, given Robert Young's "prior roles with respect to the Youngs' activities, there is a circumstantial basis to infer his involvement." Brief in Support of Accent Media's Resistance to the Young Motion at 13-14.

The court has already granted summary judgment in favor of the Youngs on Accent Media's defamation and interference with contractual relationships claims and, thus, it need not readdress them here. However, the court finds that Accent Media's copyright infringement claim against Robert Young is without merit. The record includes evidence supporting Accent Media's allegation that Carol Young committed copyright infringement. However, there is no evidence suggesting that Robert Young was involved in making the disc containing the allegedly copyright protected pictures. Accent Media's only argument in support of its assertion that the court should not grant summary judgment in favor of Robert Young on Accent Media's copyright infringement claim is that the Youngs "are not testifying truthfully with respect to Robert[ Young's] role." *Id.* at 13. Such an assertion is not sufficient to preclude summary judgment. *See Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir. 2001) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to preclude summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (internal

quotation marks omitted). Accordingly, the court shall grant the Young Motion to the extent it requests the court grant summary judgment in Robert Young's favor on Count I.

### D. Summary

In light of the foregoing, the court shall grant the Young Motion to the extent that it requests summary judgment in the Youngs' favor as to Accent Media's defamation claim in Count III because the statements at issue do not constitute defamation per se or defamation per quod. In addition, the court shall grant the Young Motion to the extent that it requests summary judgment in the Youngs' favor as to Accent Media's interference with contractual relations claim in Count II as to all three contracts at issue, namely, Accent Media's existing contract with Davenport Central High School and Accent Media's prospective contracts with Jefferson High School and Pella High School. Finally, the court shall grant summary judgment in Accent Media's favor with respect to Accent Media's copyright infringement claim in Count I against Robert Young. Accordingly, the only remaining claim in the Complaint is Count I against Carol Young for copyright infringement.

### VII. YOUNG MOTION AGAINST CRCSD AND CRCSD MOTION

In their Answer, the Youngs bring a third-party claim against CRCSD asserting that CRCSD has a duty to defend and indemnify them against Accent Media's claims in the Complaint pursuant to Iowa Code section 670.8. Iowa Code section 670.8 provides that

> The governing body shall defend its officers and employees, whether elected or appointed and shall save harmless and indemnify the officers and employees against any tort claim or demand, whether groundless or otherwise, arising out of an alleged act or omission occurring within the scope of their employment or duties. . . . The duty to save harmless and indemnify does not apply and the municipality is entitled to restitution by an officer or employee if, in an action commenced by the municipality against the officer or employee, it is determined that the conduct of the officer or employee upon which the tort claim or demand was based

> constituted a willful and wanton act or omission. . . . The
> duties to defend and save harmless and indemnify shall apply
> whether or not the municipality is a party to the action . . . .

Iowa Code § 670.8. Iowa Code sections 670.1 and 670.2 provide additional guidance. Iowa Code section 670.1 includes "school district" within the definition of "municipality." Iowa Code § 670.1(2). In addition, it defines "tort" as

> every civil wrong which results in wrongful death or injury to
> person or injury to property or injury to personal property or
> property rights and includes but is not limited to actions based
> upon negligence; error or omission; nuisance; breach of duty;
> whether statutory or other duty or denial or impairment of any
> right under any constitutional provision, statute or rule of law.

*Id.* § 670.1(4). Iowa Code section 670.2 provides that, "[f]or the purposes of this chapter, employee includes a person who performs services for a municipality whether or not the person is compensated for the services, unless the services are performed only as an incident to the person's attendance at a municipality function." Iowa Code § 670.2. "A person who performs services for a municipality . . . and who does not receive compensation is not personally liable for a claim based upon an act or omission of the person performed in the discharge of the person's duties, except for acts or omissions which involve intentional misconduct or knowing violation of the law, or for a transaction from which the person derives an improper personal benefit." *Id.*

In the Young Motion, the Youngs argue that the court should grant summary judgment in their favor with respect to their indemnity claim pursuant to Iowa Code section 670.8 for Accent Media's copyright infringement claim. The Youngs contend that CRCSD must indemnify them because the conduct at issue in the copyright infringement claim is within the scope of the Youngs' volunteer duties with Jefferson High School and the CRCSD.

CRCSD argues that it is not required to indemnify the Youngs as a matter of law because: (1) "Accent Media signed a General Release as to CRCSD releasing it from any

liability relating to either the Young-created CD or any claims for tortious interference, defamation or copyright infringement"; (2) the Youngs' conduct at issue in the Complaint was not within the scope of their volunteer duties with CRCSD; and (3) the Iowa Municipal Tort Claims Act does not apply to an alleged violation of federal copyright law. CRCSD's Resistance to the Young Motion at 2. In addition, CRCSD filed its Resistance to the Young Motion as a separate CRCSD Motion, arguing that the court should grant summary judgment in its favor with respect to the Youngs' indemnity claim against it as to each of Accent Media's claims against the Youngs for the same reasons that CRCSD resists the Young Motion.[10] In response, the Youngs argue that summary judgment in favor of CRCSD is not appropriate as to Accent Media's state-law claims because genuine issues of material fact remain. Resistance to the CRCSD Motion at 17-19. Because the arguments in CRCSD's Resistance to the Young Motion and the CRCSD Motion are identical, the court shall address both motions simultaneously.

### A. CRCSD's Release

CRCSD contends that "[b]ecause [the] Youngs' claim for indemnity is based solely upon [Jefferson High] School's vicarious liability under Iowa Code Chapter 670, and Accent Media has released [Jefferson High] School from liability, [the] Young['s] claim for indemnity must fail." Brief in Support of CRCSD's Resistance to the Young Motion (docket no. 30-1) at 14. CRCSD's argument is based on the General Release that Jefferson High School entered into with Krejci and Myers. *See* General Release, CRCSD Appendix at 36. The General Release, dated August 11, 2010, provides that, in consideration for Accent Media's receipt of nineteen CDs containing pictures of the Jefferson High School Band, Accent Media

---

[10] Thus, the Youngs seek summary judgment against CRCSD for indemnification as to the copyright infringement claim only. CRCSD seeks summary judgment on its indemnification liability as to the copyright infringement, defamation and interference with contractual relations claims.

release[s], acquit[s] and forever discharge[s] [CRCSD] and its agents, employees and contractors, from any and all liability for any and all claims, demands and causes of action for damages which Releasers may have or ever claim to have by reason of the production, copying and distribution of the Band Videos.

As further consideration of said receipt, the undersigned hereby agree:

1.     This Release covers all claims of any nature, whether known or not, and which may hereafter appear or develop, arising from the matters referred to above, including but not limited to, claims for tortious interference, libel, and copyright infringement.

. . . .

5.     CR[C]SD represents that the 19 copies referred to in Paragraph 1 are the only copies in their possession at this time, and shall forward to the Releasors any additional copies of the CD in question that it may acquire by whatever means at any time without the need for further release.

6.     This Release shall not cover Carol Young or Robert Young.

*Id.* Thus, pursuant to the release, Accent Media could not bring the instant action against CRCSD. *See id.*

As the Youngs point out in their Reply to CRCSD's Resistance to the Young Motion, they are not parties to the Release. Rather, Krejci and Myers signed the Release. Furthermore, in the Release, Accent Media gives up its right to bring claims related to the discs against CRCSD. However, the Youngs did not sign the Release, are not parties to it and did not give up their right to bring any claim against CRCSD. Thus, the Youngs assert that, because they "are not parties to the Release, they are not bound by its terms."

Reply to CRCSD's Resistance to the Young Motion at 2.

CRCSD argues that the Youngs' indemnity claim is foreclosed in light of the Release. Although CRCSD cites numerous cases, none of the cases support a finding that the Release, to which the Youngs are not a party, forecloses the Youngs from seeking indemnification from CRCSD. CRCSD relies on the Iowa Supreme Court's holding in *Biddle v. Santori Mem'l Hosp.*, 518 N.W.2d 795 (Iowa 1994). In *Biddle*, a deceased patient's estate brought a medical malpractice action against a physician, the hospital and the municipal owner of the hospital. *Id.* at 796. The physician settled the claim with the estate and the case proceeded to trial against the other two defendants and the jury returned a verdict in favor of the defendants. *Id.* The court held that the settlement with the doctor "released the hospital from any vicarious liability based on the doctor's negligence." *Id.* *See also id.* at 798 (noting that, "because vicarious liability derives solely from the principal's legal relation to the wrongdoer, settlement with the tortfeasor removes the basis for any additional recovery from the principal upon the same acts of negligence"). The court's holding in *Biddle* is in line with one of the policies behind the doctrine of joint-and-several liability and prevented the estate from recovering twice for the same wrong. The court explained this policy, stating:

> The percentage of negligence attributable to the conduct of the servant constitutes the entire single share of liability attributable jointly to the master and servant. . . . Because this percentage of negligence represents the single share of liability covered by the common liability of the master and servant, the master is necessarily released from vicarious liability for the released servant's misconduct.

*Id.* at 798 (quoting *Horejsi v. Anderson*, 353 N.W.2d 316, 318 (N.D. 1984)) (alteration in original) (internal quotation marks omitted).

CRCSD's reliance on *Biddle* is misplaced. In *Biddle*, the court released the "master" hospital from liability because the "servant" doctor paid the plaintiff-estate for his malpractice in the settlement; allowing the estate to proceed against the hospital for

43

damages based on the hospital's vicarious liability for the doctor's malpractice—damages that the doctor already paid to the estate—would result in a miscarriage of justice and allow the estate to seek a double recovery. Furthermore, *Biddle* involved a plaintiff seeking to hold one defendant-employer liable for the actions of a defendant-employee under the doctrine of vicarious liability. The instant action involves a defendant-employee seeking indemnification from a third-party-defendant employer. Accent Media released CRCSD from any potential liability involving the discs at issue, however, Accent Media and CRCSD did not settle any of the claims at issue, so there is no risk of Accent Media recovering twice.

Accordingly, the court finds that there is no reason to prevent the Youngs from seeking indemnification from CRCSD and the Release between CRCSD and Accent Media does not affect the Youngs' claim for indemnification against CRCSD. CRCSD's Motion is denied to the extent it argues the court should grant summary judgment in its favor for this reason.

### B. Scope of Volunteer Duties

Next, CRCSD asserts that the conduct underlying Accent Media's claims against the Youngs was not within the scope of the Youngs' volunteer duties and, thus, CRCSD is not liable for the conduct. CRCSD argues that it "has no duty under Iowa Code [section] 670.8 to indemnify or defend [the] Youngs from Accent Media's state-law claims because the conduct underlying the claims was outside the scope of their volunteer duties, making" Iowa Code section 670.8 inapplicable. Brief in Support of CRCSD's Resistance to the Young Motion at 19. In addition, CRCSD argues that it has no duty to indemnify the Youngs from Accent Media's copyright infringement claim because the "Youngs' acts of intentionally downloading and copying 513 photos in violation of [Accent Media's] copyright rights were outside the scope of their volunteer duties as a matter of law." *Id.* at 30-31.

The Youngs assert that "[g]enuine issues of material fact exist as to whether the

conduct underlying Accent Media's claims of defamation and interference with contract were incidental to the Youngs' employment with [CRCSD] as each and every alleged act would not have occurred but for the Youngs' volunteer duties with [CRCSD]." Reply to CRCSD's Resistance to the Young Motion at 5. In addition, the Youngs argue that the conduct underlying Accent Media's copyright infringement claim was within the scope of their volunteer duties. Resistance to the CRCSD Motion at 13-17.

### 1. *Applicable law*

"Claims asserted against School District employees acting in their capacity as School District employees are subject to Iowa Code chapter 670." *S.O. ex rel. J.O. Sr. v. Carlisle School Dist.*, 766 N.W.2d 648 (Table), 2009 WL 605994, *3 (Iowa Ct. App. March 11, 2009). "[I]f the employee is acting within the scope of his or her employment or duties, the claim is subject to chapter 670." *Id.* "[T]he question of whether an act is within the scope of employment is ordinarily a jury question, depending on the surrounding facts and circumstances, the question as to whether the act which departs markedly from the employer's business is still within the scope of employment may well be for the court." *Sandman v. Hagan*, 154 N.W.2d 113, 118 (Iowa 1967). Thus, the crux of this issue is whether the alleged acts giving rise to Accent Media's claims fall within the scope of the Youngs' volunteer duties with Jefferson High School. *See id.*

The Iowa Supreme Court has provided some guidance with respect to what conduct falls within the scope of one's employment:

> [Scope of employment] is obviously no more than a bare formula to cover the unordered and unauthorized acts of the servant for which it is found to be expedient to charge the master with liability, as well as to exclude other acts for which it is not. It refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.

> [M]any factors enter into the question: the time, place, and purpose of the act, and its similarity to what is authorized; whether it is one commonly done by such servants; the extent of departure from normal methods; the previous relations between the parties; whether the master had reason to expect that such an act would be done. . . . It has been said that in general the servant's conduct is within the scope of his employment if it is of the kind which he is employed to perform, occurs substantially within the authorized limits of time and space, and is actuated, at least in part, by a purpose to serve the master. . . .

*Vlotho v. Hardin Cnty.*, 509 N.W.2d 350, 354 (Iowa 1993) (omissions and alterations in original) (quoting W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 70, at 502 (5th ed. 1984)); *See also* Restatement (Second) of Agency §§ 228, 229.

> Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master . . .

Restatement (Second) of Agency § 228.

### 2. Application

#### a. Defamation and interference with contractual relations

The conduct underlying Accent Media's defamation and interference with contractual relations claims is: (1) Robert Young's statement to Reese that he did "not trust Krejci," Robert Young Affidavit, Young App'x at 83; (2) Carol Young's January 29, 2010 e-mail to Reese in which she inquired as to why Reese did not respond to an earlier e-mail that she had sent Reese which appears to have advised Reese to reconsider his decision to work with Krejci, January 29, 2010 E-mails, Accent Media App'x at 94; and (3) Carol Young's e-mail to Austin stating that "we have had a problem with using . . . Krejci on the Jefferson Band trip to San Diego" and suggesting that Austin inform others of this and that Pella High School officials "ask a lot of questions before using [Krejci]," January 29,

2010 E-mail, Young App'x at 74.

The court finds that these actions are not within the Youngs' scope of employment with Jefferson High School as a matter of law. To qualify as conduct "within the scope of employment," the conduct must be "of the kind [the Youngs are] employed to perform" and it must be "actuated, at least in part, by a purpose to serve [Jefferson High School]." *See* Restatement (Second) of Agency § 228. In the Youngs' Statement of Material Facts in Support of the Young Motion, the Youngs discuss the scope of their volunteer duties with CRCSD, and state that they have provided assistance to various schools within CRCSD by "audio and video taping fine arts events, letting the school utilize their trailer . . . , transporting equipment for the fine arts groups, assisting with the technology at the school building and accompanying the Jefferson [High School] Band . . . to various competitions and performances . . . [and] creating photo discs and videos for the School." Youngs' Statement of Material Facts in Support of the Young Motion ¶¶ 4-5. The Youngs draw no connection between the conduct at issue and the scope of their volunteer duties with CRCSD and none is apparent to the court. Rather, the actions at issue were personal to the Youngs, were not "of the kind [the Youngs were] employed to perform" and were not "actuated . . . by a purpose to serve" Jefferson High School. *See* Restatement (Second) of Agency § 228. Accordingly, the court shall grant the CRCSD Motion to the extent that it requests that the court grant summary judgment in CRCSD's favor with respect to the Youngs' indemnity claim as to Accent Media's defamation and interference with contractual relations claims.

### b. *Copyright infringement*

The court finds that the conduct underlying Accent Media's copyright infringement claim is within Carol Young's scope of employment with CRCSD. CRCSD does not dispute that, "[i]n [her] capacity as [a] volunteer[] for CRCSD," Carol Young's duties included "creating photo disc and videos for the School." Youngs' Statement of Material Facts in Support of the Young Motion ¶ 4-5. The conduct underlying Accent Media's

47

copyright infringement claim falls squarely within Carol Young's scope of employment with CRCSD. Accordingly, the court shall deny the CRCSD Motion to the extent that it requests that the court grant summary judgment in CRCSD's favor with respect to the Youngs' indemnity claim as to Accent Media's copyright infringement claim.[11]

### C. Iowa Municipal Tort Claims Act

Finally, CRCSD argues that it is not required to indemnify the Youngs with respect to Accent Media's copyright infringement claim because the "Iowa Municipal Tort Claims Act does not apply to a [f]ederal Copyright Infringement [c]laim." Brief in Support of CRCSD's Resistance to the Young Motion at 21. CRCSD claims that a claim asserting a violation of the federal Copyright Act is, "by definition[,] controlled, and decided, by federal law, not state law" and, therefore, Iowa Code sections 670.2 and 670.8 "have no applicability to Accent Media's copyright infringement claim for which [the] Youngs seek a defense and indemnity." *Id.* at 22-23. In their Resistance to the CRCSD Motion, the Youngs contend that Iowa Code section 670.9 applies to all tort claims, whether or not such claims arise under federal law, including a claim pursuant to the Copyright Act.

### 1. Applicable law

Federal law preempts state-law claims that fall within the subject matter of and are based upon rights protected under the Copyright Act. 17 U.S.C. § 301(a). Section 301(a) provides that:

> all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of the copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and

---

[11] Although the court finds that the conduct underlying Accent Media's copyright infringement claim is within the scope of Carol Young's employment with CRCSD, the court must address CRCSD's remaining argument as to why it claims the court should hold that the Youngs are not entitled to indemnification as to the copyright claim before ruling on this portion of the Young Motion.

> 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law of statutes of any State.

17 U.S.C. § 301(a). The Eighth Circuit has held that, with respect to copyright preemption, "[a] state cause of action is preempted if: (1) the work at issue is within the subject matter of copyright as defined in §§ 102 and 103 of the Copyright Act, and (2) the state law created right is equivalent to any of the exclusive rights within the general scope of copyright as specified in § 106." *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 428 (8th Cir. 1993) (internal citations omitted). Section 106 provides that the owner of a copyright has the exclusive right to: (1) reproduce a copyrighted work; (2) prepare derivative works; (3) distribute copies of the copyrighted work to the public; (4) display the copyrighted work publicly. 17 U.S.C. § 106. The Copyright Act "preempts only those state law rights that may be abridged by an act which, in and of itself, would infringe one of the exclusive rights provided by federal copyright law." *Nat'l Car Rental Sys., Inc.*, 991 F.2d at 431 (quoting *Computer Assocs. Int'l Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)) (internal quotation marks omitted). Thus, the Copyright Act does not preempt state-law claims if the state law protects a right that is "different in kind" from those protected under the federal law. *BVS Performance Sys., Inc. v. Mercantile Bancorporation, Inc.*, No. C98-111MJM, 2000 WL 34031502, at *2 (N.D. Iowa April 24, 2000).

The Eleventh Circuit Court of Appeals addressed the issue of whether the federal Copyright Act preempts a state common law claim for indemnification in *Foley v. Luster*, 249 F.3d 1281 (11th Cir. 2001). The Eleventh Circuit held that "the [state law] indemnity claim is not preempted by any of the bases for federal preemption." *Id.* at 1288 (applying each of the three possible basis for preemption to the state indemnification law, and finding that none preempted the indemnity claim).

### 2. Application

The Youngs' state-law indemnity claim under Iowa Code section 670.8 does not "infringe" on any "exclusive right[] provided by federal copyright law." *See Nat'l Car Rental Sys., Inc.*, 991 F.2d at 431. Because the Youngs' rights protected by Iowa Code section 670.8 are "different in kind" from those protected under the federal Copyright Act, "the Copyright Act does not preempt [Iowa Code section 670.8]," *BVS Performance Sys., Inc.*, 2000 WL 34031502, at *2. Therefore, because the conduct at issue in Accent Media's copyright infringement claim falls within the scope of the Youngs' employment with CRCSD, the Youngs are entitled to indemnification from CRCSD with respect to this claim. Accordingly, the Young Motion is granted to the extent that it requests the court grant summary judgment with respect to its indemnity claim against CRCSD as to Accent Media's copyright infringement claim. The CRCSD Motion is denied to the extent that it requests that the court grant summary judgment in its favor with respect to this claim.

### D. Summary

Based on the foregoing, the court finds that the Release that CRCSD entered into with Accent Media does not foreclose the Youngs' indemnity claim against CRCSD. In addition, the court finds that the conduct underlying Accent Media's defamation and interference with contractual relations claims is not within the scope of the Youngs' employment with CRCSD. However, the conduct underlying Accent Media's copyright claim is within the scope of Carol Young's employment with CRCSD. Finally, the court finds that neither the federal Copyright Act nor any other federal law preempts the application of Iowa Code section 670.8 in this case.

Accordingly, the Youngs are not entitled to indemnification from CRCSD with respect to Accent Media's claims asserting defamation and interference with contractual relations because the alleged conduct at issue in those claims is not within the scope of their employment with CRCSD. However, the Youngs are entitled to indemnification as to the copyright claim because the alleged conduct at issue in that claim is within the scope

of Carol Young's employment with CRCSD.

## VIII. CONCLUSION

In light of the foregoing, **IT IS HEREBY ORDERED**:

(1) Defendants and Third-Party Plaintiffs Robert and Carol Young's Motion for Summary Judgment (docket no. 25) is **GRANTED IN PART AND DENIED IN PART**. With respect to Counts II and III, summary judgment is **GRANTED** in favor of Robert Young and Carol Young. With respect to Count I, summary judgment is **GRANTED** in favor of Robert Young. With respect to the Young's Third-Party Complaint against Cedar Rapids Community School District, summary judgment is **GRANTED** in favor of Robert and Carol Young as to their indemnity claim as to Accent Media's claim in Count I. Summary judgment is **DENIED** as to the Youngs' indemnity claim as to Accent Media's claims in Counts II and III.

(2) Counts II and III of the Complaint are **DISMISSED**. Count I of the Complaint remains for trial as to Carol Young only.

(3) Third-Party Defendant Cedar Rapids Community School District's Motion for Summary Judgment (docket no. 26) is **GRANTED IN PART AND DENIED IN PART**. With respect to Cedar Rapids Community School District's claim that the Youngs are not entitled to indemnification as to Accent Media's claims in Counts II and III, summary judgment is **GRANTED** in Cedar Rapids Community School District's favor. With respect to Cedar Rapids Community School District's claim that the Youngs are not entitled to indemnification as to Accent Media's claim in Count I, summary judgment is **DENIED**.

**DATED** this 11th day of September, 2013.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA